| | |
|---|---|
| ROBERT TOMMASSELLO, | Case No. 08-CV-1190 (PJS/RLE) |
| Plaintiff, | |
| v. | |
| DONALD L. STINE, Warden at FPC-Duluth; MARK MUNSON, Associate Warden at FPC-Duluth; DR. BRUCE BARTON, Medical Director at FPC-Duluth; WHITNEY I. LEBLANC, JR. and MARTY C. ANDERSON, Wardens at FMC-Rochester; DAVID GOOD, Associate Warden at FMC-Rochester; DAVID EDWARDY, Clinical Director at FMC-Rochester; DR. TRUNG M. TRAN, Doctor at FMC-Rochester; JORGE CASTANEDA, Captain at FMC-Rochester; and DOES 1-20, all individuals, | ORDER ON DEFENDANTS' MOTION FOR DISMISSAL, JUDGMENT ON THE PLEADINGS, OR SUMMARY JUDGMENT |
| Defendants. | |

Elliot L. Olsen, PRITZKER OLSEN, P.A.; Roger Kramer and Justin Short, KRAMER & SHORT, P.A., for plaintiff.

Friedrich A.P. Siekert, UNITED STATES ATTORNEY'S OFFICE, for defendants.

Plaintiff Robert Tommassello was incarcerated in federal facilities from March 2003 until November 2005. Tommassello suffers from recurrent skin cancers that must be removed every few months by a surgeon with highly specialized training. Tommassello contends that, while he was incarcerated, prison officials violated his Eighth Amendment right to be free from cruel and unusual punishment by delaying needed surgeries and by interfering with post-surgical wound care.

Although Tommassello named numerous prison officials and guards in his complaint, he has abandoned his claims against many defendants.[1]  Tommassello now seeks to proceed against only four defendants:  Dr. Bruce Barton, the clinical director at the federal prison camp in Duluth, Minnesota ("FPC-Duluth"); Dr. David Edwardy, the clinical director at the federal medical facility in Rochester, Minnesota ("FMC-Rochester"); Dr. Trung M. Tran, a doctor at FMC-Rochester; and Jorge Castaneda, a captain of the prison guards at FMC-Rochester. Defendants move for dismissal or for summary judgment on the basis of qualified immunity.[2] For the reasons that follow, the Court denies the motion without prejudice to renewal after discovery.

## I.  BACKGROUND

The facts, taken in the light most favorable to Tommassello, are as follows:

Tommassello has Gorlin syndrome (also known as nevoid basal cell carcinoma syndrome), which is a rare genetic disorder that increases the risk of developing various tumors.[3]

---

[1]*See* Pl. Resp. Def. Mot. at 4 n.1 [Docket No. 47] (agreeing to dismissal with respect to defendants Donald L. Stine, Mark Munson, Marty C. Anderson, and David Good).  At the hearing on defendants' motion, Tommassello also agreed to dismiss his retaliation claim against all defendants, and he agreed to dismiss all of his claims against all of the Doe defendants. Moreover, Tommassello conceded that he failed to serve defendant Whitney I. LeBlanc, Jr., and agreed that LeBlanc should be dismissed from this action without prejudice.  *Id.* at 4.

[2]Defendants also moved for dismissal based on alleged defects related to service of process on the United States Attorney General.  Def. Mem. Supp. Mot. at 12-14 [Docket No. 41]. But in his memorandum opposing defendants' motion, Tommassello effectively rebutted this argument, *see* Pl. Resp. Def. Mot. at 4, and defendants have since abandoned it.  The Court therefore limits its discussion to the issue of qualified immunity.

[3]Background information about Gorlin syndrome comes from material available through the National Library of Medicine, a division of the National Institutes of Health.  *See* Nat'l Library of Medicine & NIH, Genetics Home Reference — Genetic Conditions, "Gorlin

(continued...)

Tommassello Aff. ¶ 2 [Docket No. 45].  Patients with Gorlin syndrome often develop a specific

form of skin cancer — basal-cell carcinoma — on the face, neck, and back.  To reduce their risk

of developing skin cancer, patients with Gorlin syndrome are advised to use sunscreen and to

avoid exposure to sunlight.

Tommassello has suffered from Gorlin-syndrome-related skin cancer since the 1970s.  *Id.*

¶ 3.  From about 1989 to early 2003, he was under the care of Dr. Victor Marks, a physician in

Pennsylvania.  *Id.*  Marks removed more than forty facial tumors during this period with a

specialized surgical technique called Mohs micrographic surgery.[4]  *Id.* ¶¶ 2-3; Olsen Aff. [Docket

No. 46] Ex. B.  Marks removed "multiple scores" of tumors elsewhere on Tommassello's body

by other methods.  Olsen Aff. Ex. B.  By Tommassello's estimate, Marks removed about one to

three tumors every six months, which Tommassello characterizes as "excellent control" of his

condition.  Tommassello Aff. ¶ 3.

In mid-March 2003, Tommassello was taken into federal custody in Pennsylvania to

begin serving a 37-month sentence for fraud and tax evasion.  *See United States v. Tommassello*,

No. 3:01-CR-0409-TIV, Docket Report (M.D. Pa.).  After being transferred through facilities in

---

[3](...continued)
syndrome," http://ghr.nlm.nih.gov/condition=gorlinsyndrome (last visited July 27, 2009); Nat'l
Library of Medicine & NIH, Medline Plus — Encyclopedia, "Basal cell nevus syndrome,"
http://www.nlm.nih.gov/medlineplus/ency/article/001452.htm (last visited July 27, 2009).
Copies of all Internet materials cited in this opinion have been docketed separately in the Court's
CM/ECF system.

[4]Mohs surgery is a procedure "in which skin is cut out and immediately looked at under a
microscope to check for cancer.  The process is repeated until the skin sample is free of cancer."
Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Basal cell carcinoma,"
http://www.nlm.nih.gov/medlineplus/ency/article/000824.htm (last visited July 27, 2009).

Oklahoma and Indiana, Tommassello arrived at the federal prison camp in Duluth, Minnesota on April 1, 2003. Compl. ¶ 23 [Docket No. 1]; Tommassello Aff. ¶ 4.

Tommassello met with defendant Dr. Bruce Barton, then the medical director at FPC-Duluth, on April 10 to discuss Tommassello's medical needs.[5] Tommassello Aff. ¶ 5. Barton spoke with Marks by telephone, and after the call, Barton said that Tommassello would need to see a Mohs surgeon and would be transferred in a few weeks to FMC-Rochester. *Id.*

Marks followed up his phone call with Barton by sending Barton a letter the same day. Olsen Aff. Ex. B. After providing information about Gorlin syndrome in general and about Tommassello's medical history in particular, Marks wrote:

> Because of the rapidity with which such patients develop these cancers, it is *imperative* that they be treated *often* and with a margin-controlled method such as Mohs micrographic surgery. I recommend that Mr. Tommassello be sent to Dr. Clark Otley or Dr. Randall Roenigk in the Department of Dermatology at Mayo Clinic. Both doctors are Mohs micrographic surgeons and cutaneous oncologists. I would estimate that he would require visits approximately on a quarterly basis.

*Id.* (emphasis added). The two Mohs surgeons identified by Marks (Otley and Roenigk) were associated with the Mayo Clinic in Rochester, Minnesota. The Mayo Clinic is located about one mile from FMC-Rochester, and about 225 miles from FPC-Duluth. Marks did not identify anyone in Duluth who could treat Tommassello. Barton Aff. ¶ 7 [Docket No. 35]. Further, officials at FPC-Duluth received on May 1, 2003, a memorandum from Marks dated February 17,

---

[5]In both his complaint and his affidavit, Tommassello makes numerous allegations related to his need to avoid sunlight. Specifically, he alleges that he was not promptly given the right type of sunscreen and either was not given, or was wrongly deprived of, a wide-brimmed hat and long-sleeved shirts. Tommassello Aff. ¶¶ 5, 7-10, 13-16, 24-25, 27. These allegations are largely peripheral to the key issues in the case, and therefore the Court does not discuss them in detail.

2003 in which Marks said that Tommassello would require multiple surgical procedures over the following six to eight weeks — i.e., that Tommassello would need surgery no later than early to mid-April 2003. Tran Aff. ¶ 10 [Docket No. 38].[6]

Barton admits that, based on the information from Marks, he recommended transferring Tommassello to FMC-Rochester, though Barton does not say exactly when he made this recommendation. Barton Aff. ¶ 6. In May and June 2003, Barton said that he was making efforts to transfer Tommassello to FMC-Rochester so that he could get the surgery that Marks had said he would need by April. Tommassello Aff. ¶¶ 12, 16, 18. And throughout May and June 2003 Tommassello — deprived of the surgery that he needed — was developing numerous skin-cancer lesions on his face, neck, trunk, and extremities. *Id.* ¶ 11, 17.

The nature of Barton's efforts, and the actions of other FPC-Duluth prison officials relative to transferring Tommassello to FMC-Rochester, are not clear from the record. In particular, Tommassello asserts in his complaint and in his affidavit that defendant Donald L. Stine, then the warden of FPC-Duluth, issued an order in April 2003 restricting inmate transfers in general, and that Stine refused to make an exception for Tommassello. Compl. ¶ 26; Tommassello Aff. ¶ 6. Stine, in his affidavit supporting defendants' motion, does not respond to this allegation, instead asserting only that Tommassello was transferred to FMC-Rochester "when it became apparent that he could not obtain specialized care and treatment from independent contractor medical care providers located in Duluth, Minnesota." Stine Aff. ¶¶ 7,

---

[6]The February 17 memorandum itself does not appear to be in the record, but its contents are described by Tran. Tran Aff. ¶ 10. Because defendants move for summary judgment and the memorandum favors Tommassello, the Court relies on Tran's description of the memorandum for purposes of ruling on defendants' motion. In any event, even if the Court disregarded Tran's description of the memorandum, the Court's ruling would not change.

10-12 [Docket No. 33].  And defendant Mark Munson, the associate warden of FPC-Duluth at this time, says only that he "never delayed [Tommassello's] transfer from [FPC-Duluth] to [FMC-Rochester] because his transfer required the specific approval of officials who worked in the Office of Medical Designations and Transportation."  Munson Aff. ¶ 8 [Docket No. 34]. Munson thus implies that any delay in transferring Tommassello was caused by other officials — but because Munson does not say when he (or someone else at FPC-Duluth) first *asked* those other officials to transfer Tommassello, it is impossible to tell from Munson's affidavit who was in fact responsible for what portion of the delay in transferring Tommassello.

In any event, Barton admits that he recommended canceling Tommassello's transfer request around June 24 or June 25, 2003 — two months *after* Tommassello was due for surgery (according to Marks) and *after* Tommassello had developed numerous skin-cancer lesions on his face, neck, trunk, and extremities.  Barton Aff. ¶ 7; Olsen Aff. Ex. C.  According to Barton, sometime after his April 10 conversation with Marks, Barton "learned" from an unspecified source that Dr. Robert Lund of Duluth "or another specialist might be able to provide specialized treatment for [Tommassello] while he was confined at" FPC-Duluth.  Barton Aff. ¶ 7.  In a note dated June 24, 2003, Barton wrote:

> [Tommassello] was referred for transfer to Rochester based on conversation [with his] dermatol[og]ic surgeon at Geisinger [i.e., Marks] who told me there were no Mohs surgeons at [St. Mary's Duluth Clinic] in Duluth.  In fact, there are 2 [M]ohs surgeons at St. Mary's, Drs. Lund & Bayer.  Based on this the transfer request was cancelled and a referral to these doctors was made.

Olsen Aff. Ex. C.

Barton was apparently wrong about Lund and Bayer. Tommassello saw Lund in July 2003,[7] and Lund immediately told him that Lund could not help him and that Tommassello would have to go to the Mayo Clinic (or the University of Minnesota in Minneapolis) for treatment because there were no facilities in Duluth where he could be treated. Tommassello Aff. ¶ 21.[8] Lund informed Barton that Tommassello should be treated at the Mayo Clinic — something that Marks had told Barton months earlier. Barton Aff. ¶ 4. Lund told Barton that Tommassello had at least four lesions that would definitely need treatment, two of which would require Mohs surgery. *Id.*

In light of this recommendation, sometime in late July 2003, Barton placed a new request to transfer Tommassello to FMC-Rochester. Barton Aff. ¶ 9. Officials at the Bureau of Prisons who review such requests approved the transfer on August 11, 2003, and Tommassello arrived at FMC-Rochester on August 13, 2003. *Id.*; Tommassello Aff. ¶ 23.

On August 16 — three days after Tommassello arrived at FMC-Rochester — defendant Dr. Trung M. Tran, a doctor there, requested approval from defendant Dr. David Edwardy, FMC-Rochester's clinical director, for "an evaluation by a specialist . . . ." Tran Aff. ¶ 8. Tran met

---

[7]Tommassello says that he saw Lund on July 17, 2003. Tommassello Aff. ¶ 21. Barton says that it was on July 24, 2003. Barton Aff. ¶ 9. Nothing turns on the dispute.

[8]Tommassello also asserts that Lund said that he "was not a Mohs specialist with the ability to conduct Mohs surgery." Tommassello Aff. ¶ 21. Barton does not assert in his affidavit that Lund was a Mohs surgeon, and Barton's notes do not explain why Barton believed in June 2003 that Lund was a Mohs surgeon. Although it is not part of the record, the Court notes that on the website of the dermatology department of the St. Mary's Duluth Clinic, both Lund and a Dr. Michael Bayer are currently identified as "Fellows of the American Society for Mohs Surgery." SMDC Medical Center Duluth Clinic, Dermatology — Meet Our Team, http://www.duluthclinic.org/otherspecialties/dermatology/meetourteam.htm (last visited July 27, 2009).

with Tommassello two days later, on August 18, and told Tommassello that he would be seen at the Mayo Clinic soon. Tommassello Aff. ¶ 27. Tran knew that Tommassello needed Mohs surgery. *Id.*

On August 20, 2003, Edwardy approved Tran's request that Tommassello be examined by a specialist. Tran Aff. ¶ 8. It appears that Tran did not request, nor did Edwardy approve, that Tommassello be seen by a *Mohs surgeon* at the Mayo Clinic. Instead, Tommassello's "condition was evaluated" on October 7, 2003 by Dr. Marian McEvoy, a dermatologist affiliated with the Mayo Clinic who examined Tommassello at FMC-Rochester. Tran Aff. ¶ 8; Olsen Aff. Ex. D (record dated Oct. 7, 2003). McEvoy found "numerous superficial basal cell carcinomas involving the arms, legs, and back," as well as a scrotal lesion that she suspected of being a basal-cell carcinoma. Olsen Aff. Ex. D (record dated Oct. 7, 2003). She said that Tommassello would need surgery every two to three months. *Id.* In other words, McEvoy told prison officials what Marks had told them *six months earlier*.

Tommassello did not see a Mohs surgeon until more than a month later, when he was finally treated at the Mayo Clinic by Dr. Clark Otley on November 13, 2003. (Otley was one of the two doctors that Marks had recommended to Barton back in April. Barton Aff. ¶ 6.) At that visit, Otley removed around fifteen carcinomas during surgery that lasted fourteen hours. Tommassello Aff. ¶ 29; Olsen Aff. Ex. D (record dated Nov. 13, 2003). About a month later, in late December 2003, Otley again operated on Tommassello and removed around twenty-one carcinomas during another fourteen-hour-long surgery. Tommassello Aff. ¶ 30; Olsen Aff. Ex. D (record dated Dec. 30, 2003). Otley prescribed topical imiquimod cream to treat various smaller

carcinomas.[9]  *Id.*   In sum, when Tommassello was in the care of Marks, he needed to have one to three tumors removed every six months; yet after about eight months in the care of the Bureau of Prisons, Tommassello needed to have thirty-six tumors removed during two marathon surgeries. Otley told Tommassello that he had never seen carcinomas so bad.  Tommassello Aff. ¶ 30.

Otley continued to see Tommassello regularly through June 2005.  Tommassello Aff. ¶ 31.  Between March 2004 and June 2005, Tommassello had surgery roughly every six weeks.  *Id.*; Olsen Aff. Ex. D.  Later surgeries were less serious than the two fourteen-hour surgeries that he experienced in late 2003.  Tommassello Aff. ¶ 48; Olsen Aff. Ex. D.

Tommassello apparently does not challenge the quality or timing of the medical care for Gorlin syndrome that he received in 2004 and 2005, while he was incarcerated in FMC-Rochester and regularly being treated by the Mayo Clinic.  But Tommassello does contend that defendant Jorge Castaneda, then a captain of FMC-Rochester's prison guards, gave him trouble about his sun-protective hat, and that Tommassello was medically mistreated in connection with a dispute over the hat.

According to Tommassello, in mid-April 2004, Castaneda began taking Tommassello's hat or directing other prison guards to do so.  Tommassello Aff. ¶ 32.  In mid-July, after Tommassello complained to Castaneda that a guard had taken his hat, Castaneda said that the hat was contraband and was not medically approved.  Tommassello Aff. ¶ 35.  According to

---

[9]Imiquimod (pronounced im-i-QUI-mod) cream, sold under the brand name Aldara, is used to treat, among other things, "superficial basal cell carcinoma (a type of skin cancer) on the trunk, neck, arms, hands, legs, or feet . . . .  Imiquimod is in a class of medications called immune response modifiers."  Nat'l Library of Medicine & NIH, Medline Plus — Drug Information, "Imiquimod Topical," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698010.html (last visited July 27, 2009).

Tommassello, when he again asked Castaneda for his hat, Castaneda "poked me repeatedly in the chest and told me I needed a lesson in discipline. Castaneda eventually returned my hat, but Castaneda told me I better wear the hat rain or shine, night and day, if I knew what was good for me." Tommassello Aff. ¶ 35.

In early August 2004, Castaneda reprimanded Tommassello for not wearing his hat. Tommassello Aff. ¶ 37. Tommassello responded that the hat had been locked up, and he was trying to retrieve it. *Id.* Castaneda apparently did not believe Tommassello, and this disagreement over Tommassello's hat and his truthfulness resulted in Tommassello's being placed in administrative segregation (known colloquially as "the hole"). *Id.* ¶¶ 37-38; *cf.* Castaneda Aff. ¶¶ 8-10.[10] Tommassello remained in segregation for twenty-one days, from August 4 through August 24, 2004. Castaneda Aff. ¶ 9; Tommassello Aff. ¶ 38.

During this period, Castaneda visited Tommassello in the hole and called him a "son of a bitch" and said, "I told you I'd teach you a lesson." Tommassello Aff. ¶ 38. And on August 6, at Castaneda's direction, a guard took away Tommassello's towel, washcloth, and soap. *Id.* The guards were also told not to let Tommassello change his shirt more than three times per week. *Id.*

Also during this period, on August 10, Otley performed outpatient surgery on Tommassello and removed three basal-cell carcinomas and three other abnormalities. Olsen Aff.

---

[10]Tommassello and Castaneda tell different stories about why Tommassello was placed in segregation, but they agree about when. *See* Castaneda Aff. ¶ 8-10; Tommassello Aff. ¶ 37. The reasons for Tommassello's placement in segregation are not especially relevant to his claims that he was medically mistreated while in segregation. In any event, the Court must accept Tommassello's version of the facts at this stage.

Ex. D (record dated Aug. 10, 2004); Tommassello Aff. ¶ 39. Otley told Tommassello to apply imiquimod cream and to rinse it off on alternate days. Tommassello Aff. ¶ 39.

Castaneda, however, took away Tommassello's imiquimod cream. Tommassello Aff. ¶ 39. Castaneda also prevented nursing staff from checking on Tommassello. *Id.* ¶ 41. Edwardy examined Tommassello at some point, and Tommassello said that he needed antibiotics, a special diet, and his imiquimod cream, which he needed to rinse off every other day. *Id.* ¶ 39. Edwardy responded, "I don't care" and told guards to "[p]ut him in the hole." *Id.*

While in segregation, Tommassello became infected with methicillin-resistant staphylococcus aureus (MRSA) because of his lack of a towel, soap, or washcloth. Tommassello Aff. ¶¶ 39, 43. By the time he was released from segregation, Tommassello "was soaked with blood, smelled horrible, and the skin on [his] back was seeping pus and blood." *Id.* ¶ 42. Tran visited Tommassello twice while he was in segregation and saw that Tommassello's back was seeping pus and blood, but Tran refused to treat Tommassello's condition. *Id.* ¶ 40. Tommassello lost thirty pounds while in segregation because of severe pain that left him unable to eat or drink. *Id.* ¶ 44. After his release from segregation, Tommassello was treated with heavy doses of antibiotics, and his back was bandaged for two weeks. *Id.* ¶ 45.

Tommassello was released from FMC-Rochester on November 18, 2005. He brought this suit in May 2008.

## II. DISCUSSION

### A. Standard of Review

The government moves for dismissal under Fed. R. Civ. P. 12 or for summary judgment under Fed. R. Civ. P. 56. Because the parties have submitted affidavits and documentary evidence in connection with the government's motion, the Court treats the government's motion as one for summary judgment (albeit on an extremely thin factual record). *See* Fed. R. Civ. P. 12(d).

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B. Qualified Immunity on Eighth Amendment Claims

Tommassello contends that defendants Barton, Castaneda, Tran, and Edwardy are liable under *Bivens v. Six Unknown Named Federal Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violating his right under the Eighth Amendment of the Constitution to be free

from cruel and unusual punishment. *See* U.S. Const. amend. VIII. Defendants respond that they are entitled to qualified immunity.

A government official is generally entitled to qualified immunity — and thus is not liable in a suit for damages — if, although the official violated a citizen's constitutional rights, the official did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (citing *Harlow*). In *Saucier v. Katz*, the Supreme Court directed lower courts to decide qualified-immunity questions in two steps, first by deciding whether the official seeking immunity violated a constitutional right (taking the facts in the light most favorable to the plaintiff), and second by deciding whether the constitutional right was clearly established. 533 U.S. 194, 201 (2001).

But under *Pearson v. Callahan*, courts are no longer required — though they are permitted — to undertake *Saucier*'s two-step analysis. 129 S.Ct. at 818. Instead, if a defendant establishes that the right that he allegedly violated was not clearly established at the time of the challenged actions, a district court may grant the defendant qualified immunity without first deciding whether the actions violated a constitutional right at all. *See id.*

In this case, there is no serious dispute that the constitutional right that Tommassello contends the defendants violated was clearly established. Specifically, under *Estelle v. Gamble*, a prison official violates the Eighth Amendment's prohibition on cruel and unusual punishment if the official exhibits "deliberate indifference to a prisoner's serious illness or injury . . . ." 429 U.S. 97, 105 (1976); *see also Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2007). To establish such deliberate indifference in the context of a prisoner's claim for constitutionally

inadequate medical care, the prisoner must show "more than negligence, more even than gross negligence . . . ." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). Rather, the prisoner must show both that a prison official had actual knowledge that the prisoner's medical condition created a substantial risk of serious harm to the prisoner's health, and that the official failed to act reasonably to abate that risk. *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997). In particular, "[d]elay in the provision of treatment . . . can violate inmates' rights when the inmates' ailments are medically serious or painful in nature." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989); *see also Coleman*, 114 F.3d at 786 (citing *Johnson-El*). An inmate contending that a delay in medical care violated his constitutional rights must, of course, put forth medical evidence that he was harmed by the delay. *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997).

Defendants do not dispute these legal principles, nor do they dispute that these legal principles were clearly established at the time of their alleged actions. *See* Def. Mem. Supp. Mot. at 24-29 [Docket No. 41]. Rather, defendants argue that the facts alleged by Tommassello do not show that defendants violated his Eighth Amendment rights. *Id.* at 29-32.

Tommassello seeks to recover for two distinct types of injuries: injuries related to mistreatment while he was in administrative segregation in August 2004, and injuries related to delay in treating his Gorlin syndrome. The second type of injury can be further subdivided into injuries allegedly caused by Barton and associated with Tommassello's time in FPC-Duluth, and injuries allegedly caused by Tran and Edwardy and associated with his time in FMC-Rochester. The Court first discusses Tommassello's claims with respect to his time in segregation in August 2004 and then discusses claims related to delays at FPC-Duluth and FMC-Rochester.

1. Mistreatment in August 2004 (Castaneda, Tran, and Edwardy)

According to Tommassello, he developed a serious infection while he was in administrative segregation in August 2004 because Castaneda ordered guards to take away his soap, washcloth, and towel. There can be no doubt that this infection, as Tommassello describes it, was a serious medical condition, as was Tommassello's Gorlin syndrome. Further, a jury could conclude that the infection (again, as Tommassello describes it) was so obvious that any prison official who saw him during this period must have noticed it. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). And there is no dispute that prison officials knew of his Gorlin syndrome.

The only question, then, is whether a reasonable jury could find that Castaneda, Tran, and Edwardy — the three officials who are accused of mistreating Tommassello in August 2004 — acted with deliberate indifference to his medical needs. With respect to Castaneda and Edwardy, the answer is obvious, because each allegedly made a statement demonstrating a culpable state of mind. According to Tommassello, Castaneda said, "I told you I'd teach you a lesson" — evidence that Castaneda was deliberately acting to make Tommassello's medical condition worse. Tommassello Aff. ¶ 38. And, again according to Tommassello, Edwardy said "I don't care" in response to Tommassello's complaint about his condition and request for medical care. *Id.* ¶ 39. If Castaneda and Edwardy made these statements under the circumstances described by Tommassello, a jury could find that they violated Tommassello's Eighth Amendment rights by being deliberately indifferent to his serious medical needs.

Tran's potential liability is a closer question, because Tommassello does not attribute any statements to Tran that would show his culpable state of mind. On balance, however, given the limited factual record at this stage, the Court finds that Tran has failed to establish that he is entitled to qualified immunity with respect to his treatment of Tommassello in August 2004. *See Johnson-El*, 878 F.2d at 1048 ("[Q]ualified immunity is an affirmative defense for which the defendant carries the burden of proof."). According to Tommassello, Tran visited him twice while he was in segregation and saw his back was seeping pus and blood, yet Tran ignored Tommassello's condition and did nothing to help him. Tommassello Aff. ¶ 40. Given that Tommassello describes his condition as obvious and asserts that Tran in fact noticed it, *id.*, and given that Tran was a doctor whose very job was to take care of prisoners such as Tommassello, Tran's failure to treat Tommassello could be found to be deliberate indifference by a reasonable jury.

### 2. Delay in Duluth (Barton)

Tommassello was taken into custody in March 2003 and did not see a Mohs surgeon — the only type of doctor (it appears from the record) who could treat Tommassello's Gorlin syndrome — until November 2003. Both the medical records and Tommassello's affidavit indicate that this eight-month delay caused him serious harm.[11]

_____

[11]Defendants contend that because Tommassello's Gorlin syndrome predated his confinement, and because Tommassello's skin cancers resulted from his Gorlin syndrome, any harm Tommassello complains of was caused by his Gorlin syndrome and not by defendants. Def. Mem. Supp. Mot. at 29 ("If the injury upon which Tommassello bases his claim is the existence of the skin cancer lesions themselves, that 'injury' was actually a pre-existing condition for which there can be no recovery here."). Defendants also contend that Tommassello "does not allege that his outcome would have been any different but for the alleged delay in providing the [Mohs] surgery or protective measures that were in fact provided." *Id.* at 30.

(continued...)

The Court cannot tell from the current record, however, whether Barton's role in the delay reflects deliberate indifference on his part. For one thing, there is insufficient medical evidence to determine the urgency of Tommassello's need to be seen by a Mohs surgeon when he arrived at FPC-Duluth in April 2003. But the record evidence so far points to a failure on Barton's part to ensure that Tommassello was seen promptly. Marks told Barton in April that Tommassello should be seen "approximately on a quarterly basis" by a Mohs surgeon. Olsen Aff. Ex. B. And in a memorandum dated February 17, 2003 and received by FPC-Duluth officials on May 1, 2003, Marks said that Tommassello would need multiple surgical procedures six to eight weeks from February 17 — that is, sometime in April 2003. *See* Tran Aff. ¶ 10. Yet even based on the recommendation of quarterly treatment found in the April letter from Marks to Barton, Tommassello should have been seen by a Mohs surgeon no later than mid-June, given that he was taken into custody in mid-March.[12] Yet it was not until late June that Barton decided to send Tommassello to Lund, who did not see Tommassello until late July — at which time Lund said that he could not help Tommassello. At the very least, this sequence of events seems to reflect negligence, and perhaps gross negligence, on Barton's part.

---

[11](...continued)

These arguments hardly merit comment. Tommassello plainly contends that by wrongfully delaying his treatment, defendants caused him to suffer more than he would have if defendants had treated him promptly. Again, when Tommassello was being properly cared for by Marks, he was having one to three tumors removed every six months. By the time that prison officials finally arranged for Otley to operate on him — eight months after Tommassello was taken into custody — Tommassello needed to have thirty-six tumors removed during two marathon surgeries. The fact that Tommassello's suffering may have been caused by the *combination* of his Gorlin syndrome and defendants' inadequate medical care does not relieve defendants of their duty under the Eighth Amendment not to be deliberately indifferent to Tommassello's serious medical needs.

[12]Marks last treated Tommassello on March 4, 2003. Tommassello Aff. ¶ 3.

Whether Barton acted with negligence or gross negligence — or whether he instead acted with deliberate difference — depends on what Barton knew, what he did, and what he might have done differently. For instance, Barton requested that Tommassello be transferred to FMC-Rochester at some unknown time after mid-April and then canceled the request in late June. Barton does not say when or how he first requested the transfer, nor does he say what information led him to believe that Lund could treat Tommassello. Did Barton needlessly delay asking for a transfer because he did not take Tommassello's condition seriously? Did Barton make a casual transfer request when he could have made an urgent one that would have been acted on more quickly? (The transfer request made by Barton in late July 2003 was approved — and Tommassello was transferred — in two to three weeks.) Did Barton needlessly send Tommassello to Lund (who declined to treat him) — thus delaying Tommassello's treatment by two months or more — when Barton could have learned just by calling Lund that Tommassello would need to see a different doctor? None of these questions can be answered from the record. Because essentially all of the information needed to answer these questions is in Barton's hands, the Court finds that he has not carried his burden of establishing that he is entitled to qualified immunity.

### 3. Delay in Rochester (Tran and Edwardy)

By the time Tommassello arrived at FMC-Rochester in August 2003, he was already months overdue to be seen by a Mohs surgeon based on Marks's recommendation, and he was covered with skin-cancer lesions. Yet instead of promptly scheduling an appointment with a Mohs surgeon, Tran and Edwardy arranged for Tommassello to be seen in early October by a dermatologist who was not a Mohs surgeon. In light of Marks's conversation with Barton in

April, Marks's February 17 memorandum, the seriousness of Tommassello's condition in August 2003 (when he arrived in Rochester), and the severity of Tommassello's condition in November (when Otley finally operated on him), this delay seems to reflect even greater negligence than the delay at FMC-Duluth. But whether it reflects deliberate indifference is hard to determine from this record.

Both Tran and Edwardy attempt to avoid responsibility for Tommassello's medical problems by asserting that they relied on qualified specialists from the Mayo Clinic to treat him. Tran Aff. ¶¶ 3, 9, 14-16; Edwardy Aff. ¶¶ 8-9, 13-15. But although Tran and Edwardy may have delegated the job of *caring for* Tommassello to those specialists, Tran and Edwardy were responsible for *referring* Tommassello to those specialists, and for ensuring that he was referred in a timely manner. If an inmate needs immediate brain surgery that a prison doctor cannot perform, and the prison doctor knows this but decides, out of animus or indifference, not to refer the inmate for surgery for a month, the doctor cannot escape liability for wrongly delaying the surgery just because the patient is eventually seen (too late) by a brain surgeon. Thus, the affidavits of Tran and Edwardy do not sufficiently address the key issue with respect to their liability: whether they acted with deliberate indifference when they arranged Tommassello's medical care, or whether instead they acted reasonably or, at worst, with negligence or gross negligence. The Court therefore finds that Tran and Edwardy have not carried their burden of establishing that they are entitled to qualified immunity with respect to the delay in referring Tommassello for treatment of his Gorlin syndrome after his arrival at FMC-Rochester.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      Defendants' amended motion for dismissal, judgment on the pleadings, or

        summary judgment [Docket No. 30] is GRANTED IN PART as follows:

        a.      With respect to defendant Donald L. Stine, plaintiff Robert Tommassello's

                complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

        b.      With respect to defendant Mark Munson, plaintiff Robert Tommassello's

                complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

        c.      With respect to defendant Whitney I. LeBlanc, Jr., plaintiff Robert

                Tommassello's complaint is DISMISSED WITHOUT PREJUDICE.

        d.      With respect to defendant Marty C. Anderson, plaintiff Robert

                Tommassello's complaint is DISMISSED WITH PREJUDICE AND ON

                THE MERITS.

        e.      With respect to defendant David Good, plaintiff Robert Tommassello's

                complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

        f.      With respect to defendants Does 1-20, plaintiff Robert Tommassello's

                complaint is DISMISSED WITHOUT PREJUDICE.

        g.      With respect to the remaining defendants — Bruce Barton, David

                Edwardy, Trung M. Tran, and Jorge Castaneda — plaintiff Robert

                Tommassello's "Second Cause of Action" for retaliation in violation of

the First Amendment is DISMISSED WITH PREJUDICE AND ON THE

MERITS.

2.    Defendants' amended motion for dismissal, judgment on the pleadings, or

summary judgment [Docket No. 30] is DENIED WITHOUT PREJUDICE in all

other respects.


Dated:  July  28 , 2009                                    s/Patrick J. Schiltz
                                                           Patrick J. Schiltz
                                                           United States District Judge