UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

ROBERT TOMMASSELLO,

Plaintiff,

v.

DONALD L. STINE, Warden at FPC-Duluth;
MARK MUNSON, Associate Warden at
FPC-Duluth; DR. BRUCE BARTON,
Medical Director at FPC-Duluth; WHITNEY
I. LEBLANC, JR. and MARTY C.
ANDERSON, Wardens at FMC-Rochester;
DAVID GOOD, Associate Warden at FMC-
Rochester; DAVID EDWARDY, Clinical
Director at FMC-Rochester; DR. TRUNG M.
TRAN, Doctor at FMC-Rochester; JORGE
CASTANEDA, Captain at FMC-Rochester;
and DOES 1-20; all individuals,

Defendants.

Case No. 08-CV-1190 (PJS/LIB)

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

---

Justin P. Short and Roger L. Kramer, KRAMER & SHORT, LLC, and Elliot L. Olsen,
PRITZKER, RUOHONEN & ASSOCIATES, for plaintiff.

Friedrich A. P. Siekert, UNITED STATES ATTORNEY'S OFFICE, for defendants.

Plaintiff Robert Tommassello suffers from a rare form of skin cancer that is exacerbated

by exposure to sunlight. Tommassello alleges that while he was incarcerated in two federal

correctional facilities — the Federal Prison Camp in Duluth, Minnesota, and then the Federal

Medical Center in Rochester, Minnesota — defendants Dr. Bruce Barton, Dr. David Edwardy,

Dr. Trung Tran, and Captain Jorge Castaneda violated his Eighth Amendment right to be free

from cruel and unusual punishment.[1]  Specifically, Tommassello contends that defendants acted

with deliberate indifference to Tommassello's serious medical needs when they delayed

treatment and temporarily deprived him of protective items (such as a wide-brim hat and a

prescription skin cream).[2]  Tommassello alleges that defendants' actions caused him to develop a

large number of skin tumors, necessitating lengthy and painful surgeries.

The Court concludes that, although Tommassello was not well served by the federal

prison system, none of the individual defendants acted with deliberate indifference to his medical

needs.  The Court therefore grants defendants' motion for summary judgment.

## I.  BACKGROUND

### A.  Tommassello's Medical Condition and Initial Incarceration

Tommassello has suffered from basal-cell nevus syndrome (also known as nevoid basal-

cell carcinoma syndrome or Gorlin's syndrome) since the 1970s.  Tommassello Aff. ¶¶ 2, 3

[Docket No. 45].  Patients with basal-cell nevus syndrome have an increased risk of developing a

specific type of tumor (often referred to as a lesion or a carcinoma) on the surface of their skin.

Tommassello Aff. ¶ 2.  To reduce their likelihood of developing such tumors, patients with

basal-cell nevus syndrome are typically advised to avoid exposure to sunlight and to take

---

[1]The Court previously dismissed Tommassello's claims against the other defendants, as well as Tommassello's First Amendment claims against Dr. Barton, Dr. Edwardy, Dr. Tran, and Castaneda.  *See Tommassello v. Stine*, 642 F. Supp. 2d 910 (D. Minn. 2009) [Docket No. 54].

[2]Tommassello's complaint also alleges that Dr. Barton acted with deliberate indifference in failing to provide Tommassello with a long-sleeved shirt and a sufficiently strong sun screen. Compl. ¶¶ 25, 38.  But Tommassello did not mention these claims in responding to defendants' summary-judgment motion and, when questioned about these claims at oral argument, Tommassello could not point to any reason why defendants' motion for summary judgment on these claims should be denied.  The Court therefore dismisses these claims with prejudice.

protective measures — such as wearing a wide-brim hat and strong sun screen — when outside in the sun.  Tommassello Aff. ¶ 2.

From about 1989 until early 2003, Tommassello was under the care of Dr. Victor Marks, a Pennsylvania doctor.  Tommassello Aff. ¶ 3.  Dr. Marks removed more than forty facial tumors during this period with a specialized surgical technique known as Mohs micrographic surgery.[3]  Barton Decl. Ex. 1 [Docket No. 67-1].  Dr. Marks removed "multiple scores" of tumors elsewhere on Tommassello's body using other methods.  *Id.*  By Tommassello's estimate, Dr. Marks removed about one to three tumors every six months, which provided what Tommassello characterizes as "excellent control" of his condition.  Tommassello Aff. ¶ 3.

In March 2003, Tommassello was convicted of mail fraud and tax evasion and was sentenced to a 37-month term of imprisonment.  Tommassello Dep. No. 2 at 3; *United States v. Tommassello*, No. 3:01-CR-0409-TIV, Docket Report (M.D. Pa.).  Tommassello's last treatment with Dr. Marks before entering prison occurred on March 4, 2003.  Tommassello Aff. ¶ 3.  On that day, Dr. Marks removed a small number of tumors.  Tommassello Dep. No. 1 at 64.  Tommassello was free of tumors when he entered federal custody in mid-March 2003.  *Id.*

After being processed, Tommassello arrived at the Federal Prison Camp in Duluth, Minnesota  ("FPC-Duluth") on April 1, 2003.  Tommassello Aff. ¶ 4.  Dr. Barton, the clinical director at FPC-Duluth, performed an intake examination of Tommassello on the day that he arrived.  Tommassello Dep. No. 1 at 72-73.  Dr. Barton met again with Tommassello a few days

---

[3]Mohs surgery is a procedure "in which skin is cut out and immediately looked at under a microscope to check for cancer. The process is repeated until the skin sample is free of cancer." Nat'l Library of Medicine & NIH, Medline Plus-Encyclopedia, "Basal cell carcinoma," http://www.nlm.nih.gov/medlineplus/ency/article/000824.htm (last visited January 3, 2011).

later, on April 10, 2003.  Tommassello Dep. No. 1 at 73; Barton Decl. ¶ 8.  During that

consultation, Dr. Barton called Dr. Marks (Tommassello's personal physician in Pennsylvania) to

discuss Tommassello's condition and his ongoing medical needs.  Barton Decl. ¶ 8.  At Dr.

Barton's request, Dr. Marks sent him a letter summarizing the treatment that Tommassello would

need.  *Id*.  The letter read, in part:

> Because of the rapidity with which [basal-cell nevus syndrome]
> patients develop these cancers [on their skin], it is imperative that
> they be treated often and with a margin-controlled method such as
> Mohs micrographic surgery.  I recommend that Mr. Tommassello
> be sent to Dr. Clark Otley or Dr. Randall Roenigk in the
> Department of Dermatology at Mayo Clinic.  Both doctors are
> Mohs micrographic surgeons and cutaneous oncologists.  I would
> estimate that he would require visits approximately on a quarterly
> basis.

Barton Decl. Ex. 1.  Apart from Dr. Marks's statement that he "would estimate" that

Tommassello should see a Mohs surgeon "approximately on a quarterly basis," neither Dr.

Marks's letter nor his conversation with Dr. Barton suggested that Tommassello's need for Mohs

micrographic surgery was urgent.  *See id*.; Barton Decl. ¶ 8.

### B.  Initial Redesignation Request for Tommassello

After speaking to Dr. Marks, Dr. Barton decided to submit a request that Tommassello be

transferred to the Federal Medical Center in Rochester, Minnesota ("FMC-Rochester").  Barton

Decl. ¶ 8.  Before submitting the request, though, Dr. Barton wanted to receive the letter from Dr.

Marks, as Dr. Barton wanted to cite Dr. Marks's letter in support of his request to transfer

Tommassello.  Although Dr. Marks's letter was dated April 10, 2003, Dr. Barton did not receive

the letter until May 2, 2003.  Barton Decl. ¶ 9.  No one knows why delivery of the letter was

delayed.

Transferring a prisoner from one federal correctional facility to another requires that the prisoner first be "redesignated" to the new facility by the Bureau of Prisons ("BOP"). When the purpose of transferring an inmate is to make available medical treatment, the Office of Medical Designations and Transportation ("OMDT"), a division of the Bureau of Prisons ("BOP"), is responsible for redesignating the inmate to an appropriate facility. Stevens Decl. ¶ 6 [Docket No. 66]. A prison official such as Dr. Barton can request that an inmate be redesignated, but the ultimate decision is OMDT's. Thus, before Tommassello could been seen by the Mayo Clinic dermatologists recommended by Dr. Marks: (1) OMDT would have to redesignate Tommassello to FMC-Rochester; (2) a bed would have to become available for Tommassello at FMC-Rochester; and (3) after arriving at FMC-Rochester, Tommassello would have to receive a referral to the nearby Mayo Clinic.

When a prison official submits a request to OMDT that a prisoner be redesignated, the prison official also makes a recommendation about the urgency of the need for redesignation. Stevens Decl. ¶ 10. OMDT recognizes three levels of urgency in redesignation requests: "emergency," "routine-urgent," and "routine." Stevens Decl. ¶ 11. Emergency status is reserved for rare instances when the inmate needs specialized transportation (such as needing to receive oxygen or intravenous fluids en route) or immediate inpatient care. *Id*. Routine-urgent status is appropriate when the inmate's circumstances are similar to, but less critical than, circumstances calling for emergency care. *Id*. All other inmates receive routine status. *Id*. If an inmate is being transferred to receive outpatient medical care (as was true in Tommassello's case), the redesignation is almost always classified as routine. Stevens Decl. ¶¶ 7, 11. Like the decision

about whether to redesignate a prisoner, the decision about the urgency of the redesignation is made by OMDT. Stevens Decl. ¶¶ 6, 10.

After OMDT redesignates an inmate to FMC-Rochester, FMC-Rochester places the inmate into one of four categories, depending on the type of treatment the inmate will need: (1) medical inpatient; (2) medical outpatient; (3) mental-health inpatient; and (4) mental-health outpatient. Stevens Decl. ¶ 7. A limited number of beds is available for each category. In 2003, for example, FMC-Rochester had 35 beds for medical-inpatient and 211 beds for medical-outpatient. Stevens Decl. ¶ 8. Moreover, at all times, at least 2 of those 246 medical beds had to remain unoccupied to accommodate any emergencies that might arise. *Id*.

After OMDT redesignates an inmate to FMC-Rochester, the inmate is placed into what prison officials refer to as "the pipeline." Stevens Decl. ¶ 6. Pamela Stevens, a nurse at FMC-Rochester, is responsible for assigning inmates in the pipeline to beds at FMC-Rochester as those beds become available. *Id*. Within each urgency category, she assigns beds to inmates in the pipeline on a first-come, first-served basis. Stevens Decl. ¶ 12. Later-redesignated inmates who are categorized as emergency or routine-urgent receive placements before earlier-designated inmates who are categorized as routine. *Id*.

On May 5, 2003 — just three days after Dr. Barton received Dr. Marks's letter — Dr. Barton requested that Tommassello be redesignated to FMC-Rochester. Barton Decl. ¶ 12; *see also* Stevens Decl. Ex. 2 at 1. Again, neither Dr. Marks's letter nor his conversation with Dr. Barton had suggested that it was urgent that Tommassello see a Mohs surgeon. Barton Decl. ¶ 12. Reflecting that fact, Dr. Barton recommended to OMDT that Tommassello's redesignation be classified as routine. Barton Decl. ¶ 12; Stevens Decl. Ex. 2 at 1.

On May 12, 2003 — just one week after Dr. Barton submitted the redesignation request — OMDT approved the request, redesignated Tommassello to FMC-Rochester, and categorized Tommassello's transfer as routine. Stevens Decl. Ex. 3; Stevens Decl. ¶ 17. At that point, Tommassello was placed in the pipeline for transfer to FMC-Rochester. Stevens Decl. ¶ 17. Pursuant to her standard protocol, Stevens placed Tommassello last among the 34 inmates then in the pipeline. *Id.* Stevens e-mailed FPC-Duluth to notify medical personnel that she did not expect to have a bed available for Tommassello for about two months. Stevens Decl. Ex. 4.

During the ensuing weeks, medical personnel at FPC-Duluth regularly contacted Stevens to seek updates about the availability of a bed for Tommassello at FMC-Rochester. Barton Decl. ¶ 13. Stevens continued to tell FPC-Duluth that she did not have any openings and that Tommassello was "way down in the pipeline list." Stevens Decl. ¶ 22. On June 23, 2003, Stevens once again told medical personnel at FPC-Duluth that it would be several weeks before a bed would open for Tommassello. Barton Decl. ¶ 14.

### C. FPC-Duluth Rescission of Tommassello's Redesignation Request

Meanwhile, a member of the medical staff at FPC-Duluth learned from his wife, a pediatrician at SMDC Health System in Duluth ("SMDC"), that there were dermatologists at SMDC who could perform Mohs surgery. Barton Decl. ¶ 15. Rather than continue to wait for a bed to open for Tommassello at FMC-Rochester, Dr. Barton decided that he should try to get an appointment for Tommassello with one of the Mohs surgeons at SMDC. *Id.* Tommassello agreed. Tommassello Dep. No. 1 at 80-81. In an e-mail dated June 24, 2003, FPC-Duluth requested that Tommassello's redesignation to FMC-Rochester be rescinded. Stevens Decl. ¶ 23.

The same day, Dr. Barton contacted SMDC to request an appointment for Tommassello. Barton Dep. at 40.

Dr. Robert Lund, a dermatologist at SMDC, saw Tommassello on July 23, 2003. Barton Decl. ¶ 17. According to Tommassello, Dr. Lund said that he did not do Mohs surgery, that Tommassello's condition was much worse than he had anticipated, and that Tommassello should be immediately transferred to the University of Minnesota or the Mayo Clinic for treatment. Tommassello Dep. No. 1 at 80. Dr. Lund disputes Tommassello's account.[4] According to Dr. Lund, he is a Mohs surgeon, and he could have performed Mohs surgery on Tommassello. Lund Decl. ¶ 5 [Docket No. 68]. Dr. Barton recalls that Dr. Lund conveyed to FPC-Duluth medical staff that, although Dr. Lund could perform Mohs surgery that would provide some benefit to Tommassello, Dr. Lund recommended that Tommassello instead be seen at the Mayo Clinic, in part because the Mayo Clinic could give Tommassello access to experimental treatments. Barton Decl. ¶ 18.

Dr. Lund's notes from Tommassello's visit reflect that Tommassello told him that he "now thinks he is actually doing fairly well. He is not certain that he has any growing spots, but he presents for evaluation and our recommendation on his therapy and care." Barton Decl. Ex. 2 at 2. Dr. Lund's evaluation of Tommassello revealed only four basal cells requiring treatment: two "very tiny" tumors that might be curetted off; a three-centimeter basal cell, possibly recurrent, on his left shoulder; and a somewhat indurated one-centimeter plaque near his left temple. Barton Decl. Ex. 2 at 3. Dr. Lund noted that the latter two tumors might require Mohs

_____

[4]It is not necessary to resolve this dispute, as what matters for purposes of Tommassello's claim against Dr. Barton is not what Dr. Lund told *Tommassello*, but what Dr. Lund told *Dr. Barton*.

surgery. *Id.* Although Dr. Lund identified more than 80 basal cells on Tommassello's arms and legs, he did not recommend a particular course of treatment for them. *Id.* Dr. Lund promptly provided to Dr. Barton a written summary of his evaluation of Tommassello, and that summary did not express any urgency with respect to Tommassello's treatment. *Id.* In other words, as of late July 2003, Dr. Barton (the prison doctor) knew that Tommassello's condition had been evaluated by Dr. Lund (the dermatologist), and that Dr. Lund had not suggested that Tommassello's need for treatment was urgent.

### D. FPC-Duluth's Reinitiation of Tommassello's Resdesignation Request

After Dr. Barton received Dr. Lund's written summary, Dr. Barton immediately asked OMDT to "re-redesignate" Tommassello for transfer to FMC-Rochester, and OMDT promptly approved that request on July 25, 2003. Barton Decl. ¶ 19; Stevens Decl. ¶ 26. Once again, OMDT classified Tommassello's redesignation as routine. *Id.* Stevens placed Tommassello back into the pipeline based on his original redesignation date of May 12, 2003; in other words, Tommassello did not lose his place in line. Stevens Decl. ¶ 28.

A bed became available for Tommassello on August 11, 2003, and Tommassello arrived at FMC-Rochester on August 13, 2003. Stevens Decl. ¶¶ 29, 30. Dr. Barton's involvement with Tommassello ended at that point.

### E. Tommassello's Referral from FMC-Rochester to the Mayo Clinic

Inmates at FMC-Rochester are sometimes treated by doctors at the Mayo Clinic. The Mayo Clinic's dermatology department requires that all inmates seeking treatment at the Mayo Clinic — even those with referrals from their personal physicians — must first receive a preliminary evaluation by a Mayo dermatologist. Papke Decl. ¶ 6 [Docket No. 69]; Tran Decl.

-9-

¶ 8 [Docket No. 70]. These evaluations are typically performed during outreach clinics that are conducted on a regular basis at FMC-Rochester by the Mayo dermatology department. Papke Decl. ¶ 7. FMC-Rochester cannot schedule an appointment with a Mayo dermatologist for a prisoner until that prisoner has first been evaluated at an outreach clinic. Tran Decl. ¶ 8, 18.

The outreach clinics at FMC-Rochester are almost always filled to capacity. Papke Decl. ¶ 8. Because patients are assigned a spot at the outreach clinics on a first-come, first-served basis, it typically takes six to eight weeks for a new inmate to be evaluated by a Mayo dermatologist. Papke Decl. ¶ 10. Helen Papke, a Mayo medical secretary who works with FMC-Rochester, cannot recall a single instance in her 40-year career in which one prisoner was bumped in favor of another at a dermatology outreach clinic. Papke Decl. ¶¶ 6, 10. Once an inmate is evaluated at an outreach clinic, the evaluating doctor makes a recommendation regarding follow-up treatment at the Mayo Clinic. Papke Decl. ¶ 16. If the evaluating doctor recommends, and FMC-Rochester approves, follow-up treatment at the Mayo Clinic, then the follow-up treatment is scheduled in accordance with the appropriate physician's scheduling policies. *Id.*

On August 16, 2003 — just three days after Tommassello arrived at FMC-Rochester — Dr. Tran (a physician at FMC-Rochester) prepared a consultation request, asking that Tommassello be seen by a Mayo dermatologist at one of the outreach clinics. Tran Decl. ¶ 11. Dr. Tran's consultation request briefly described Tommassello's medical history and asked that Tommassello receive "evaluation and recommendation for management (surgery and retinoid consideration)." Tran Decl. ¶ 13. Dr. Tran's consultation request did not express any particular urgency with respect to Tommassello. Tran Decl. ¶ 16. That same day, a Mayo resident

conducted an intake examination of Tommassello. Tran Decl. ¶ 16. The Mayo resident did not note the presence of any tumors that required immediate attention. *Id*.

Two days later, on August 18, 2003, Dr. Tran met with Tommassello for the first time and dictated a comprehensive chart note. Tran Decl. ¶ 11. Dr. Tran did not note any tumors that required immediate attention. Tran Decl. ¶ 16. That same day, Dr. Tran discussed Tommassello's case with Dr. Edwardy, the clinical director at FMC-Rochester. Tran Decl. ¶ 11. Dr. Edwardy approved the consultation request on August 20, 2003. Tran Decl. ¶ 11; Edwardy Decl. ¶ 11 [Docket No. 73]. Pursuant to the standard scheduling policy, Tommassello was given the next available appointment at a Mayo outreach clinic — specifically, an appointment for October 7, 2003. Papke Decl. ¶ 14.

At the October 7 clinic, a Mayo dermatologist examined Tommassello and she, too, noted no particular urgency with respect to Tommassello's condition. Tran Decl. ¶ 16. At this point, then, a total of five doctors had evaluated Tommassello — two who were employed by the BOP (Dr. Barton and Dr. Tran) and three who were not (Dr. Lund, the Mayo resident, and the Mayo dermatologist). Two of those five doctors were specialists (Dr. Lund and the Mayo dermatologist). And yet no one had expressed the opinion that Tommassello's need for Mohs surgery was urgent.

Following the evaluation at the outreach clinic, the Mayo dermatologist evidently recommended that Tommassello see Dr. Otley for Mohs surgery. (Dr. Otley was one of the two Mayo physicians whom Dr. Marks had recommended in his letter to Dr. Barton.) Patients who had not previously seen Dr. Otley were scheduled on a first-come, first-served basis. Papke Decl. ¶ 17. Because Mohs surgery takes a long time, uses specialized equipment, and requires higher-

than-average staffing, Mohs surgeries must typically be scheduled far in advance. *Id.* In 2003, it typically took about six weeks for a new patient to schedule Mohs surgery with Dr. Otley. Otley Decl. ¶ 11 [Docket No. 72].

Dr. Otley first performed Mohs surgery on Tommassello on November 13, 2003 — about five weeks after Tommassello's evaluation at the Mayo outreach clinic. Tommassello Aff. ¶ 29. The surgery lasted 14 hours, and Dr. Otley removed 15 tumors. *Id.* Dr. Otley again performed Mohs surgery on December 20, 2003. That surgery also lasted about 14 hours, and Dr. Otley removed at least 21 tumors. Tommassello Aff. ¶ 30. Thereafter, and continuing until June 2005, Tommassello underwent additional surgeries roughly every six weeks. Each of those surgeries lasted between six and eight hours and resulted in the removal of tumors from Tommassello's lips, eyelids, nose, neck, cheeks, and ears. Tommassello Aff. ¶ 31.

### F. Alleged Mistreatment Relating to Tommassello's Hat

Ordinarily, prisoners are not permitted to wear clothing that is not issued by their prison. When Tommassello was at FPC-Duluth, though, he received permission to wear a special hat to protect his head, neck, and ears from sunlight. Under BOP policy, Tommassello had to carry his permission form — or "medical idle" — while he was wearing the hat. If he did not, the hat could be confiscated by a corrections officer. Castaneda ¶ 8 [Docket No. 74].

When Tommassello arrived at FMC-Rochester, he sought and received a second medical idle (dated August 14, 2003) that permitted him to wear his hat. Tommassello Aff. ¶ 35; Castaneda Decl. ¶ 11. But, according to Tommassello, despite the fact that he had received permission to wear his hat at FMC-Rochester — and despite the fact that he carried the medical idle while wearing the hat — he nevertheless experienced conflict with Castaneda (the captain at

FMC-Rochester) and other corrections officers over the hat.  A review of the record reveals the following hat-related incidents:

First, Castaneda confiscated Tommassello's hat in August or September 2003, not long after Tommassello's arrival at FMC-Rochester.  Tommassello Dep. No. 2 at 48, 50.  Tommassello was carrying the required medical idle at the time.  *Id*.

Second, on October 5, 2003, a corrections officer named J. Kirby confiscated the hat and placed it in storage.  BOP Central File Section 3 at 29 [Docket No. 84-1].  Kirby returned the hat two days later.  *Id*.

Third, Tommassello alleges that sometime after April 15, 2004, Castaneda or corrections officers acting on his orders repeatedly confiscated Tommassello's hat, even though Tommassello carried the appropriate medical idle.  Tommassello Aff. ¶ 32.  Tommassello alleges that corrections officers confiscated his hat multiple times per week.  Tommassello Dep. No. 2 at 53-54.

Fourth, on about June 14, 2004, Tommassello filled out a prisoner complaint form (known as a "cop out") complaining that "[i]n the last 7 days my [approved] hat . . . has been taken from me causing unnecessary risk of sun exposure that would further exacerbate my condition."  BOP Central File Section 6 at 19.  The cop out does not identify which officer or officers took Tommassello's hat.  *Id*.

Fifth, on about July 13, 2004, Tommassello spoke to Castaneda because "a guard" (presumably not Castaneda, who Tommassello identifies by name) had taken his hat.  Tommassello Aff. ¶ 35.  Castaneda responded that the hat was contraband and that the August 14, 2003 medical idle was not sufficient.  *Id*.

Sixth, on August 4, 2004, Tommassello's hat was inadvertently locked in the chapel when Tommassello stepped out of a class being held in the chapel to use the bathroom. Tommassello Aff. ¶ 37. Tommassello went to the dining room to find someone who could help him retrieve his hat. *Id.* Castaneda saw Tommassello and reprimanded him for not wearing his hat. *Id.*

Tommassello was then placed in the special housing unit ("SHU") at FMC-Rochester for disciplinary reasons, including for not wearing his hat on August 4. *Id.* A staff member took Tommassello's hat when he entered the SHU, and another staff member returned the hat when Tommassello left the SHU roughly four weeks later. Castaneda Decl. Ex. 2. Tommassello could have asked for a separate medical idle for use of his hat while in the SHU, but apparently he made no such request. Castaneda Decl. ¶ 12. It is not clear why Tommassello needed a separate medical idle for the SHU, or whether anyone ever told him that he needed a separate medical idle, or even whether he spent much time outdoors while confined in the SHU.

At some point in August 2004, Tommassello wrote a cop out asking that he be transferred to the Federal Correctional Institution in Otisville, New York, so that he could get away from "the Captain + guards taking my hat 2-3 times a week." BOP Central File Section 6 at 18. Tommassello's request was denied, *id.* at 51, but Drs. Edwardy and Tran evidently responded to the cop out by signing new medical idles for Tommassello. Castaneda Decl. ¶ 13; Castaneda Decl. Exs. 3, 4.

The cop out submitted by Tommassello in August 2004 also mentions an incident involving "the Captain striking [Tommassello] in the chest + threatening [him] several times." BOP Central File Section 6 at 18. This appears to refer to an incident described by Tommassello

in an affidavit. Tommassello claims that on one occasion, he went to Castaneda to recover his hat. Tommassello Aff. ¶ 35. Castaneda poked Tommassello in the chest and told Tommassello that he needed to learn a lesson in discipline. *Id*. When Castaneda eventually returned the hat, Castaneda allegedly told Tommassello that he had better wear his hat "rain or shine, night and day" if he knew what was good for him. *Id*.

### G. Alleged Mistreatment in the SHU

Tommassello contends that during the time that he was confined in the SHU, Castaneda directed corrections officers to prevent Tommassello from changing his shirt more than three times per week and to take away Tommassello's wash cloth, towel, and soap. Tommassello Aff. ¶ 38. According to Tommassello, the guard who took away his wash cloth, towel, and soap said that he was doing so on Castaneda's orders. Tommassello Dep. No. 3 at 37. Tommassello does not explain why he believes that Castaneda was also responsible for the shirt-changing restriction. Tommassello says that, when he complained about these deprivations to Castaneda, Castaneda called him a "son of a bitch" and told him, "I told you I would teach you a lesson." Tommassello Aff. ¶ 38.

While Tommassello was confined in the SHU, Dr. Otley prescribed a skin cream called imiquimod (sometimes known by the brand name of Aldara) to be applied and washed off on alternating days. Tommassello Aff. ¶ 39. Dr. Otley hoped that the imiquimod might shrink some of Tommassello's tumors and reduce the need for surgery. Tommassello Dep. No. 1 at 130. At first, Tommassello was able to keep the imiquimod in his cell in the SHU, but he alleges that it was soon confiscated. Tommassello Dep. No. 2 at 125.

It is not clear who confiscated the imiquimod. In his affidavit, Tommassello states that Castaneda personally took it, Tommassello Aff. ¶ 39, but in his deposition, Tommassello does not clearly say whether it was taken by Castaneda or a corrections officer acting on Castaneda's orders, Tommassello Dep. No. 2 at 125.

After the immiquimod was taken, SHU nurses were responsible for applying it. Tommassello Dep. No. 2 at 124. Tommassello contends that, without his wash cloth, towel, or soap, the nurses were unable to wash off the imiquimod on the schedule prescribed by Dr. Otley. Tommassello Aff. ¶ 39; Tommassello Dep. No. 2 at 124. For a few days, the nurses applied the imiquimod to Tommassello's back, but they eventually stopped applying it for reasons that are not clear. *Id.*

Tommassello contends that because the imiquimod was not washed off frequently enough, his back became infected with a strain of methicillin-resistant staphylococcus aureus ("MRSA"). Tommassello Aff. ¶¶ 39, 43. But there is no evidence — apart from Tommassello's own lay opinion — that Tommassello contracted MRSA in the SHU. Tommassello Dep. No. 3 at 12. Indeed, all of the medical evidence in the record is to the contrary. When Tommassello was released from the SHU in August 2004, no staph infection was apparent. Tran Decl. ¶ 29. Four months later, when Tommassello was tested in connection with an unrelated infection, Tommassello tested negative for staph bacteria. Tran Decl. ¶ 32. Not until July 2005, when Tommassello was tested in connection with yet another unrelated infection, did Tommassello finally test positive for staph bacteria. Tran Decl. ¶ 37; *see also* Tommassello Dep. No. 2 at 145. This was almost a year after Tommassello had been released from the SHU.

Tommassello's factual allegations with respect to Dr. Edwardy — and, in particular, with respect to Dr. Edwardy's involvement in the mistreatment of Tommassello in the SHU — are contradictory and confusing. At times, Tommassello has alleged that Dr. Edwardy personally examined Tommassello while he was in the SHU, after Castaneda confiscated the imiquimod. Tommassello Aff. ¶ 39. In this version of events, Tommassello told Dr. Edwardy that he needed to be able to apply and wash off the imiquimod on alternating days,[5] and Dr. Edwardy replied "I don't care" and told a guard to "[p]ut him in the Hole." Tommassello Aff. ¶ 39. (The "hole" is a colloquial term for the SHU.)

At his deposition, though, Tommassello clearly testified — and testified repeatedly — that although Dr. Edwardy saw him while he was en route to the SHU, Dr. Edwardy never examined him while he was in the SHU. Tommassello Dep. No. 3 at 56-57; Tommassello Dep. No. 2 at 204. Dr. Edwardy denies seeing Tommassello at any time during his stay in the SHU.[6]

---

[5]At various times, Tommassello has claimed that, while he was in the SHU, Dr. Edwardy failed to ensure that he received Keflex (an antibiotic prescribed by Dr. Otley) and his special diet. Tommassello Aff. ¶ 39. Tommassello has also claimed that, after the imiquimod was confiscated, Dr. Edwardy stopped the nurses in the SHU from applying the imiquimod to Tommassello's back. Tommassello Dep. No. 2 at 203. But Tommassello made no mention of these claims against Dr. Edwardy in opposing defendants' summary-judgment motion, and the Court can find no support for these claims in the record. The Court will therefore dismiss these claims with prejudice.

[6]Tommassello previously contended that Dr. Tran visited him twice in the SHU — and that, during those visits, Dr. Tran saw that Tommassello's back was infected and yet refused to treat him. Tommassello Aff. ¶ 40. But Tommassello said nothing about this claim in opposing defendants' motion for summary judgment, and, at oral argument, Tommassello conceded that he could not point to any evidence of Dr. Tran acting with deliberate indifference toward Tommassello while he was in the SHU. The Court will therefore dismiss with prejudice Tommassello's SHU-related claims against Dr. Tran.

Edwardy Decl. ¶¶ 21, 28.  Thus Tommassello could not have complained to Dr. Edwardy about the confiscation of the imiquimod.

Tommassello was released from FMC-Rochester on November 18, 2005.  He filed this lawsuit in May 2008.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

### B.  Eighth Amendment Claims

Tommassello contends that Dr. Barton, Dr. Edwardy, Dr. Tran, and Castaneda are liable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violating his right under the Eighth Amendment to be free from cruel and unusual punishment.  *See* U.S. Const. amend. VIII.  Under *Estelle v. Gamble*, a prison official violates the Eighth Amendment's prohibition on cruel and unusual punishment when the official demonstrates "deliberate indifference to a prisoner's serious illness or injury . . . ."  429 U.S. 97, 105 (1976); *see also Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008).

The standard that applies to a *Bivens* action is more demanding than the standard that applies to a medical-malpractice action. To establish deliberate indifference, a prisoner who claims that he was denied timely and appropriate medical care must show "more than negligence, more even than gross negligence . . . ." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). Rather, "[d]eliberate indifference is akin to criminal recklessness." *Drake v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006). Specifically, the prisoner must show both (1) that a prison official had actual knowledge that the prisoner's medical condition created a substantial risk of serious harm to the prisoner's health and (2) that the prison official failed to act reasonably to abate that risk. *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997). Prison officials do not violate the Eighth Amendment when they reasonably respond to a known risk, even if their response is unsuccessful in preventing the threatened harm. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994); *see also Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (citing *Farmer*).

Tommassello alleges that Dr. Barton (at FPC-Duluth) and Drs. Edwardy and Tran (at FMC-Rochester) violated the Eighth Amendment when they unreasonably delayed his access to Mohs surgery. "Delay in the provision of treatment . . . can violate inmates' rights when the inmates' ailments are medically serious or painful in nature." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989); *see also Coleman*, 114 F.3d at 786 (citing *Johnson-El*).

1. Delayed Treatment

*a. Evidence Supporting Delayed-Treatment Claim*

Tommassello primarily relies on two pieces of evidence in contending that defendants acted with deliberate indifference in delaying his access to Mohs surgery:

First, in his April 2003 letter to Dr. Barton, Dr. Marks "estimate[d]" that Tommassello would need to see a Mohs surgeon on "approximately" a quarterly basis. Barton Decl. Ex. 1. Dr. Marks himself testified that he would consider a four-month interval between dermatology appointments to be consistent with his recommendation that Tommassello be seen "approximately" once per quarter. *Id*. In fact, Dr. Marks agreed that if Tommassello missed a quarterly appointment, "that's not earth-shattering in terms of the progress of [his] treatment." *Id*. Dr. Marks himself does not ordinarily consider Mohs surgery to be an urgent procedure. According to Dr. Marks, even a patient with a two-centimeter facial tumor could reasonably be expected to wait a month or two before undergoing Mohs surgery. Marks Dep. 30-31.

Second, in Dr. Marks's expert report, he opined that the fact that "Tommassello had multiple extensive Mohs surgeries to remove basal cell carcinomas" — beginning with the first surgery conducted by Dr. Otley on November 13, 2003 — "is an indication of medical neglect." Second Olsen Aff. Ex. C at 3. But in neither his expert report nor at his deposition did Dr. Marks testify that any *particular* defendant acted with "neglect," much less that any particular defendant acted with deliberate indifference. Rather, Dr. Marks essentially reasoned backwards: Because Dr. Otley had to remove so many tumors in November 2003, *someone* must have done *something* wrong prior to November 2003.

What Dr. Marks says may very well be true — and, indeed, the Court assumes that it *is* true for purposes of ruling on defendants' summary-judgment motion. The problem, though, is that *Bivens* liability cannot be predicated on collective guilt. A federal official can be held liable under *Bivens* only for a constitutional violation that he himself committed; he cannot be held liable for the unconstitutional acts of others. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).

And that is Tommassello's problem in this case. Tommassello was not well served by the federal prison system as a whole. He should not have needed 28 hours of surgery to remove three dozen tumors in November and December of 2003. But, on this record, a reasonable jury cannot find that any *particular* defendant acted with deliberate indifference.

As recounted above, on October 7, 2003, Tommassello was examined by a Mayo dermatologist — presumably someone who was well qualified to assess Tommassello's condition. And yet that dermatologist gave no indication (in word or action) that she considered Tommassello's situation urgent. Three months earlier, on July 23, 2003, Tommassello had been examined by Dr. Lund — a dermatologist and Mohs surgeon, who would presumably know whether Tommassello's needs were urgent. And yet Dr. Lund also gave no indication (in word or action) that he considered Tommassello's situation urgent.

When a dermatologist examines Tommassello on July 23 and expresses no urgency — and when another dermatologist examines Tommassello on October 7 and expresses no urgency — it is difficult to conclude that the three prison doctors who have been sued in this case acted with deliberate indifference "akin to criminal recklessness" in failing to recognize that Tommassello had an urgent need for Mohs surgery. *Drake*, 445 F.3d at 1042. True, Dr. Marks had "estimated" in April that Tommassello would need Mohs surgery "approximately" every three months. But Dr. Marks was estimating, and, of course, he did not actually see Tommassello while he was incarcerated. Dr. Lund and the Mayo dermatologist *did* see Tommassello, and neither gave Dr. Barton, Dr. Edwardy, or Dr. Tran any reason to believe that Tommassello was urgently in need of Mohs surgery.

Ultimately, that is why Tommassello's delayed-treatment claim must fail. If Tommassello's own expert witness cannot testify that Dr. Barton, or Dr. Edwardy, or Dr. Tran was even negligent, then obviously no reasonable jury can find them deliberately indifferent.

Although that largely disposes of Tommassello's delayed-treatment claim, the Court will briefly address Tommassello's specific allegations regarding each of the individual defendants.

### b. Delay in Duluth (Dr. Barton)

Tommassello alleges that Dr. Barton demonstrated deliberate indifference toward his medical needs while Tommassello was imprisoned in Duluth by delaying Tommassello's access to Mohs surgery. Tommassello points to four specific instances of delay:

First, Tommassello complains that, following his April 10, 2003 telephone conversation with Dr. Marks, Dr. Barton waited 25 days before submitting the request that Tommassello be redesignated to FMC-Rochester. During the April 10 conversation, Dr. Barton asked Dr. Marks to send a letter explaining Tommassello's need for Mohs surgery at the Mayo Clinic. Dr. Barton had good reason to delay submitting the redesignation request until he received Dr. Marks's letter. Barton Decl. ¶ 8. Tommassello had just arrived at FPC-Duluth after being processed by the BOP; during that processing, the BOP had reviewed medical information about Tommassello's condition and decided that he did *not* need to be confined at FMC-Rochester. Thus, Dr. Barton had to change the mind of OMDT, and it was reasonable for Dr. Barton to wait until he could use Dr. Marks's letter to support the redesignation request.

Dr. Barton submitted the redesignation request on May 5, 2003, just three days after receiving Dr. Marks's letter. It is not clear why Dr. Barton did not receive the letter until May 2, when the letter was dated April 10. The fault could have been with Dr. Marks's office, or with

the United States Postal Service, or with the mailroom at FPC-Duluth. But the record contains no evidence that Dr. Barton was at fault. Under these circumstances, no reasonable jury could find that Dr. Barton acted with deliberate indifference by not submitting the redesignation request until May 5.

Second, Tommassello complains that, when Dr. Barton finally submitted the redesignation request, he failed to recommend that the redesignation be treated as an emergency or as routine-urgent. But at the time that Dr. Barton made the recommendation, Tommassello's need for Mohs surgery was *not* urgent. Dr. Marks had told Dr. Barton that Tommassello would need to undergo Mohs surgery "approximately" every three months. Barton Decl. Ex 1. Emergency and routine-urgent designations are reserved for inmates who require medical attention in a matter of days or weeks, not those who can wait months. *See* Stevens Decl. ¶ 11.

After Tommassello was placed in the pipeline, Dr. Barton had no control over when a bed would become available for him at FMC-Rochester.[7] Nevertheless, Dr. Barton did what he could to expedite Tommassello's transfer. Dr. Barton's staff repeatedly called FMC-Rochester to see whether and when space would become available, and at one point Dr. Barton himself left a message for Dr. Edwardy asking him to do what he could to make space for Tommassello. Barton Dep. 35. Under these circumstances, a reasonable jury could not find that Dr. Barton

---

[7]Tommassello suggests that because FMC-Rochester always kept one or two beds available for emergencies, he could have been given one of those "emergency" spaces. Br. Opp. S.J. at 7. But Stevens testified that those beds were held for *in*-house emergencies — that is, to accommodate emergencies that arose among those who are already incarcerated at FMC-Rochester. Stevens Decl. ¶ 8. Like any inmate approved for a transfer to FMC-Rochester, Tommassello had to wait his turn.

acted with deliberate indifference in failing to recommend to OMDT that Tommassello's redesignation be treated as an emergency or as routine-urgent.

Third, Tommassello complains that Dr. Barton made little effort to get Tommassello seen by Dr. Lund (the dermatologist at SMDC) in a timely fashion. This is a difficult complaint to understand. Dr. Barton requested an appointment with Dr. Lund almost immediately after learning that Dr. Lund was a Mohs surgeon. Dr. Barton contacted Dr. Lund's office on June 24; Tommassello was seen by Dr. Lund one month later. According to Dr. Barton, it normally takes several months to secure an appointment with a dermatologist, and thus Tommassello's delay was unusually short. Barton Dep. 41. A reasonable jury could not conclude that Dr. Barton's failure to get Tommassello an earlier appointment with Dr. Lund reflected deliberate indifference.

Moreover, it is difficult to know how Tommassello was harmed by any delay. After seeing Tommassello, Dr. Lund decided *not* to treat him, but instead to recommend that he be treated at the Mayo Clinic. *See Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (an inmate who claims that a delay in medical care violated his constitutional rights must provide medical evidence that he was harmed by the delay). There is no reason to believe that, had Dr. Lund seen Tommassello earlier, he would have made a different decision.

Finally, Tommassello complains that Dr. Barton did not take adequate steps to confirm in advance that Dr. Lund would be able to treat Tommassello. It is not clear what Tommassello believes Dr. Barton should have done, or how Tommassello believes he was harmed by Dr. Barton's omission. As soon as Dr. Barton was advised — correctly, as it turned out — that Dr. Lund was a Mohs surgeon, he scheduled an appointment for Tommassello. After examining

Tommassello, Dr. Lund concluded that he could perform Mohs surgery on Tommassello, but that Tommassello's long-term medical needs would be better served at the Mayo Clinic, where Tommassello would have access to experimental treatment.  Barton Dep. 43-44; Barton Decl. ¶ 18.  Dr. Barton, acting on Dr. Lund's advice, reinitiated Tommassello's redesignation request, and Tommassello was restored to his place on the waiting list.  Thus, Dr. Lund *was* qualified to treat Tommassello, and Dr. Barton's sending Tommassello to Dr. Lund did not delay his transfer to FMC-Rochester.  Stevens Decl. ¶ 28.  No reasonable jury could find that Dr. Barton acted with deliberate indifference in failing to more carefully investigate Dr. Lund's qualifications before making an appointment for Tommassello, and no reasonable jury could find that any omission on Dr. Barton's part caused any harm to Tommassello.

In sum, Dr. Barton did not act with deliberate indifference to Tommassello's medical needs while he was incarcerated at FPC-Duluth.  Dr. Barton is therefore entitled to summary judgment.

### c. Delay in Rochester (Dr. Edwardy and Dr. Tran)

Just as Tommassello blames Dr. Barton for the delay between his arrival at FPC-Duluth and his transfer to FMC-Rochester, Tommassello blames Dr. Edwardy and Dr. Tran for the delay between his arrival at FMC-Rochester and his first surgical treatment at the Mayo Clinic.  Specifically, Tommassello argues that Drs. Edwardy and Tran acted with deliberate indifference in two ways:  First, after Dr. Tran's intake examination of Tommassello, neither Dr. Edwardy nor Dr. Tran attempted to expedite Tommassello's outreach-clinic appointment.  In other words, neither Dr. Edwardy nor Dr. Tran lobbied the Mayo Clinic to let Tommassello "cut in line" and take the place of another prisoner who had waited longer for an appointment.  Second, after

Tommassello had his outreach-clinic appointment and the Mayo dermatologist recommended that he undergo Mohs surgery, neither Dr. Edwardy nor Dr. Tran lobbied Dr. Otley to expedite Tommassello's surgical appointment.

With respect to the first delay, Drs. Edwardy and Tran acted reasonably in not seeking special treatment for Tommassello. Tommassello arrived at FMC-Rochester about three weeks after being examined by Dr. Lund. At that appointment, Tommassello stated that he was doing "fairly well," and Dr. Lund noted the presence of only four tumors that required surgical removal. Two of those tumors were "very tiny" and might be removed without Mohs surgery, one was about one centimeter, and one was "up to" three centimeters. Barton Decl. Ex. 2 at 3. As noted above, Dr. Lund did not in any way suggest that any of the tumors that he found required urgent surgery. As Dr. Marks himself acknowledged, a patient who presents with a two-centimeter tumor can reasonably be expected to wait up to two months before undergoing Mohs surgery.

Furthermore, neither Dr. Tran nor the Mayo resident who performed Tommassello's intake examination noted the presence of any tumors that required immediate attention.[8] Based on the information available to Dr. Tran — and to Dr. Edwardy, who did not examine Tommassello when he arrived at FMC-Rochester, but instead relied on Dr. Tran's recommendation and Tommassello's file — the failure to recommend that Tommassello be the

---

[8]Tommassello points to a chart note dictated by Dr. Tran following his meeting with Tommassello on August 18 as evidence that Dr. Tran observed numerous urgent tumors on Tommassello's face and body. Br. Opp. S.J. at 15. Dr. Tran noted that Tommassello "has had numerous, perhaps 40 facial malignanc[ies] and 100 of other lesions over the body that were severe enough to be treated by MOHS surgery." Second Olson Aff. Ex. D at 1 [Docket No. 89-4]. But that statement plainly references Tommassello's *medical history*, not his *present condition*. The statement uses the past tense, and it both precedes and follows other statements describing Tommassello's past medical care by Dr. Marks and Dr. Lund. *Id.*

first prisoner in at least 40 years to be allowed to leapfrog over other inmates waiting for an outreach-clinic appointment was not unreasonable.

With respect to the second delay — that is, the delay between Tommassello's examination by a Mayo dermatologist at the outreach clinic on October 7 and his surgery with Dr. Otley on November 13 — there is no evidence that it was even *possible* for Dr. Otley to see Tommassello earlier, much less that Dr. Edwardy or Dr. Tran could have done anything to expedite Tommassello's surgery. Dr. Otley worked for the Mayo Clinic, not FMC-Rochester, and his surgical schedule was set by his scheduler, not Dr. Edwardy or Dr. Tran. Papke Decl. ¶ 17. Because Mohs surgery takes a long time, uses specialized equipment, and requires higher-than-average staffing, Dr. Otley's scheduler typically scheduled Mohs surgery to be performed about six weeks after an appointment was requested. Otley Decl. ¶¶ 9, 11.

These are factors over which Drs. Edwardy and Tran had no control, and given that the Mayo dermatologist who examined Tommassello on October 7 did not express any urgency, it is fanciful to believe that Drs. Edwardy and Tran — two non-specialists — could have convinced Dr. Otley to treat Tommassello's situation as an emergency. Under these circumstances, no reasonable jury could find that the delay between Tommassello's outreach-clinic appointment with a Mayo dermatologist on October 7 and his first surgical appointment with Dr. Otley on November 13 was cause by the deliberate indifference of Dr. Edwardy or Dr. Tran.

### 2. Mistreatment With Respect to Tommassello's Hat (Castaneda)

Tommassello alleges that sometime after April 15, 2004, Castaneda began taking Tommassello's hat or directing one of the other corrections officers to do so. Tommassello Aff. ¶ 32. But Tommassello has offered no evidence in support of his bare assertion that Castaneda

told other corrections officers to confiscate Tommassello's hat. In the absence of such evidence, Castaneda can be held liable only for those instances in which he himself took Tommassello's hat.

Based on the evidence in the record, a reasonable jury could find that Castaneda personally took Tommassello's hat a few times. Tommassello Dep. No. 2 at 48, 50. A reasonable jury could further find that Castaneda was aware that sunlight posed a risk to Tommassello's health, and that Castaneda acted with deliberate indifference to that risk. But a reasonable jury could not find that the limited additional exposure to sunlight that resulted from Castaneda's actions caused any injury to Tommassello. *See Calloway v. Miller*, 147 F.3d 778, 781 (8th Cir. 1998) (to establish a constitutional violation, "the plaintiff must establish that the defendants' unconstitutional action was the 'cause in fact' of the plaintiff's injury.").

Needless to say, expert testimony would be necessary to establish a link between the additional exposure to sunlight and Tommassello's later development of tumors. Tommassello has presented no such testimony. Tommassello's expert witness, Dr. Marks, is extremely vague about what types of acts by prison officials might have caused what types of harm. *See* Second Olsen Aff. Ex. C. Certainly nothing that Dr. Marks says would allow a reasonable jury to find that the marginal increase in sunlight exposure caused by Castaneda's occasional confiscation of Tommassello's hat caused Tommassello's tumors to spread and metastasize.

### 3. Mistreatment in the SHU

#### *a. Dr. Edwardy*

In an affidavit, Tommassello swore that while he was in the SHU he told Dr. Edwardy that he had been deprived of his imiquimod, wash cloth, towel, and soap, and that Dr. Edwardy

responded "I don't care" and told a guard to "[p]ut him in the Hole." Tommassello later admitted that, in fact, Dr. Edwardy never saw him while he was confined in the SHU, and that the statements that Tommassello quoted in his affidavit had been made while Tommassello was *on his way* to the SHU — *before* he had been deprived of his imiquimod and toiletry items, and *before* he had contracted any infection. Tommassello Dep. No. 2 at 201, 204; Tommassello Dep. No. 3 at 56-57. Tommassello also testified in his deposition that he does not know why the SHU nurses stopped applying the imiquimod to his skin, even though he had earlier blamed Dr. Edwardy. Tommassello Dep. No. 3 at 33.

Having recanted his earlier sworn testimony, Tommassello presents no evidence that Dr. Edwardy had any contact with Tommassello or issued any instructions about Tommassello's medical care in the SHU. Specifically, Tommassello has presented no evidence that Dr. Edwardy knew about any infection that Tommassello may have contracted in the SHU, that Dr. Edwardy knew of any deprivation of the imiquimod or toiletry items, or that Dr. Edwardy told the nurses (or knew of someone else telling the nurses) to stop applying the imiquimod.

Reflecting this absence of evidence, Tommassello now argues that Dr. Edwardy acted with deliberate indifference when he allowed Tommassello to be confined in the "general" SHU rather than in the "medical" SHU. Tommassello suggests that conditions in the general SHU were less sanitary than conditions in the medical SHU, and thus he might not have developed a staph infection if he had been sent to the medical SHU. Tommassello Dep. No. 2 at 201. Putting aside the fact that there is no evidence — except Tommassello's unqualified say-so — that he contracted a staph infection in the general SHU, Tommassello's claim that he would not have contracted such an infection in the medical SHU is highly speculative. Moreover, even if

everything that Tommassello says is true, Dr. Edwardy would be guilty of negligence, not deliberate indifference.

In short, no reasonable jury could find that Dr. Edwardy acted with deliberate indifference with respect to Tommassello's medical needs while Tommassello was confined in the SHU.

### b. Castaneda

#### i. Removal of Wash Cloth, Towel, and Soap from SHU Cell

Tommassello testified that the (unidentified) corrections officer who removed the wash cloth, towel, and soap from his SHU cell told him that he was acting on Castaneda's orders. Tommassello Dep. No. 3 at 37. That out-of-court statement, offered to prove the truth of the matter asserted, is inadmissible hearsay. Tommassello presents no other evidence that Castaneda was responsible for the removal of these items.

Under Fed. R. Civ. P. 56(e)(1), a party supporting or opposing a summary-judgment motion may rely only on "facts that would be admissible in evidence." *See also Sokol & Assocs., Inc. v. Techsonic Indus., Inc.*, 495 F.3d 605, 611 n.4 (8th Cir. 2007) ("only evidence that would be admissible at trial may be relied upon to counter a motion for summary judgment"). The only admissible evidence in the record regarding whether Castaneda ordered the removal of Tommassello's wash cloth, towel, and soap is Castaneda's testimony that he did no such thing. Castaneda Decl. ¶ 22. Therefore Castaneda is entitled to summary judgment on this claim.[9]

---

[9]Even if Tommassello had submitted admissible evidence that Castaneda ordered that Tommassello's wash cloth, towel, and soap be taken, the Court would nevertheless dismiss this claim against Castaneda because there is no evidence that would permit a reasonable jury to find that Castaneda's order caused Tommassello to develop an infection or caused Tommassello's tumors to multiply or metastasize.

ii.  Removal of Imiquimod from SHU Cell

Tommassello testified that he personally saw Castaneda remove the imiquimod from his cell.  But removing the imiquimod from Tommassello's cell did not, in and of itself, reflect deliberate indifference to Tommassello's medical needs.  That depends on what Castaneda *did* with the imiquimod.  And the evidence in the record suggests that if Castaneda did indeed take the imiquimod, he gave it to the nurses in the SHU to administer to Tommassello.  Tommassello himself admits that, following removal of the imiquimod from his cell, SHU nurses continued to apply the medication. Tommassello Dep. No. 2 at 124, 203.  Thus, Castaneda's taking the imiquimod from Tommassello's cell and giving it to the SHU nurses did not betray deliberate indifference to Tommassello's medical needs.

Tommassello nevertheless complains that the SHU nurses applied the imiquimod only to his back (not to his legs or arms) and that, after a few days, the SHU nurses altogether stopped applying the imiquimod.  Tommassello Dep. No. 2 at 124-25.  But Tommassello has offered no evidence that Castaneda had anything to do with the actions of the SHU nurses.  Indeed, Tommassello admits that he does not know why the nurses stopped applying the imiquimod. Tommassello Dep. No. 3 at 33 ("And then they [the nurses] stopped coming at all.  And I don't know who stopped them from doing that.").  Tommassello speculates that Castaneda must have been behind the decision, because "Castaneda pretty much ran the Institution." *Id*.  But this is speculation, not evidence.

Dr. Edwardy testified that all decisions with respect to Tommassello's medical care while in the SHU — including decisions about whether, how, and when to apply the imiquimod — would have been made by the physician assistants and nurses in the SHU, in consultation with

the doctor assigned to the SHU and Tommassello's assigned doctor (Dr. Tran). Edwardy Decl.

¶ 27. Tommassello submits no evidence contradicting Dr. Edwardy's testimony. Castaneda is

entitled to summary judgment on this claim as well.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT defendants' motion for summary judgment [Docket No. 64] is

GRANTED, and plaintiff Robert Tommassello's complaint is DISMISSED WITH PREJUDICE

AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  February  3 , 2011                         s/Patrick J. Schiltz
                                                   Patrick J. Schiltz
                                                   United States District Judge